UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAY BRADSHAW,

                              Plaintiff,

                - against -

THE CITY OF NEW YORK, DORA SCHRIRO, LARRY WILSON, CAPTAIN JOHN DOES 1–30, New York City Department of Corrections—Emergency Service Unit, OFFICER JOHN DOES 1–120, New York City Department of Corrections—Emergency Service Unit, and CAPTAIN JOHN DOE 1, Green Haven Correctional Facility,

                              Defendants.

**OPINION AND ORDER**

15 Civ. 4638 (ER)

Ramos, D.J.:

      Jay Bradshaw ("Bradshaw" or "Plaintiff") brings this action under 42 U.S.C. § 1983 ("Section 1983") alleging violations of his Fourth and Eighth Amendment rights by Defendants the City of New York, Dora Schriro, Larry Wilson, Captain John Does 1–30 of the New York City Department of Corrections—Emergency Service Unit, and Officer John Does 1–120 of the New York City Department of Corrections—Emergency Service Unit, as well as Defendant Captain John Doe 1 of the Green Haven Correctional Facility. *See* Compl. (Doc 1). On July 24, 2017, Defendants the City of New York, Larry Wilson, and Dora Schriro (together, "Defendants") filed this motion for summary judgment. Doc. 81. For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[1]

Bradshaw is an inmate of the New York State Department of Corrections, and has been housed at Rikers Island and Green Haven Correctional Facility ("Green Haven"). *See* Compl. ¶¶ 1, 77. Between May 1, 2012, and February 5, 2014, he was subjected to sixty allegedly unconstitutional strip searches. *See* Compl. ¶¶ 11–70; Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1") (Doc. 83) ¶ 3. Specifically, on twenty-eight occasions, Bradshaw was transported to the Bronx Hall of Justice ("Bronx Court") and subjected to two strip searches conducted by New York City Department of Corrections—Emergency Services Unit ("ESU") officers: one at 5:00 a.m. at Downstate Correctional Facility ("Downstate") before being transported to Bronx Court, and the other at 6:00 p.m. at Bronx Court before being transported back to Downstate. *Id.* ¶¶ 40–126.[2] On two additional occasions, on May 7, 2013 and July 15, 2013, Bradshaw was strip searched at Downstate in preparation for transportation to Bronx Court but was not strip searched again in the evening. *Id.* ¶¶ 87–88, 101.[3] On two other occasions, on January 16, 2014, and February 5, 2014, Bradshaw was strip searched at Bronx Court at 6:00 p.m., but not at Downstate. *Id.* ¶¶ 127–130.

On or around April 24, 2013, Bradshaw was transferred to Green Haven. *See* Declaration of Megan Conger in Support of Defendants' Motion for Summary Judgment (Doc. 96) Ex. A ("Bradshaw Dep."), at 27:18–28:22. After that point, Bradshaw was strip searched at Green

---

[1] The following facts are drawn from the Complaint, Doc. 2, Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def.'s 56.1"), Doc. 83, Plaintiff's Counter-Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl.'s 56.1"), Doc. 94, and the parties' supporting submissions.

[2] The relevant dates are: May 1, 2012; May 8, 2012; May 15, 2012; May 31, 2012; June 26, 2012; July 24, 2012; September 11, 2012; September 12, 2012; September 19, 2012; September 21, 2012; September 27, 2012; December 6, 2012; February 5, 2013; February 14, 2013; March 20, 2013; April 24, 2013; June 4, 2013; June 12, 2013; June 27, 2013; July 10, 2013; August 20, 2013; August 21, 2013; September 3, 2013; September 5, 2013; October 4, 2013; November 4, 2013; November 22, 2013; and December 9, 2013.

[3] On May 7, Bradshaw was not ultimately transported to Bronx Court. *Id.* ¶ 88. On July 15, he did go to Bronx Court, but it is unclear why he was not strip searched again that evening. *Id.* ¶ 101.

Haven, transported to Downstate, strip searched at Downstate, and then transported to Bronx Court. *Id.* at 153:6–24.

At Downstate, there were five intake cells in which strip searches occurred. Defs.' 56.1 ¶¶ 21–22. The first two intake cells had a single wall-mounted camera, three concrete walls, and a steel door with a barred window. *Id.* ¶¶ 24–26. Those cells did not have either a toilet or a sink. *Id.* ¶ 28. The other three cells were constructed of two concrete walls and two "gated" walls. *Id.* ¶¶ 29–30. Those cells also had a toilet and a sink. *Id.* ¶ 31.

At Bronx Court, the cells had three concrete walls and a gated "entrance" which looked "like a fence" and was made of metal. *Id.* ¶¶ 32–33. Cameras mounted on walls outside the cells were positioned to face inside the cells. *Id.* ¶ 34. Because Bradshaw was considered a "category" inmate, he was always the single occupant of the cell in which he was placed and searched. *Id.* ¶¶ 36–37. Bradshaw would also wait in one of those cells after any court appearances. *Id.* ¶ 35.

All of the strip searches were conducted by male ESU officers. *Id.* ¶¶ 8, 18. None of the officers physically touched Bradshaw; however, Bradshaw was required to take off all his clothing while the officers performed a "visual search." *Id.* ¶¶ 10–11. Bradshaw was also required to squat, lift his scrotum and penis, open his mouth, and expose his armpits as part of the search. *Id.* ¶ 14. Bradshaw was also in view of a surveillance camera during each strip search, *id.* ¶ 15, and in view of inmates in nearby cells or officers who were walking by. *Id.* ¶ 16. During the searches that took place at Downstate, Bradshaw was required to stand barefoot near the toilet. *Id.* ¶ 12. At both institutions, the floors of the cells in which Bradshaw was strip

3

searched were dirty. Bradshaw Dep. 39:9–41:16.[4] The searches lasted for no more than five minutes. Defs.' 56.1 ¶ 19.

Bradshaw further alleges that two isolated incidents that occurred during or immediately after his strip searches also violated his Eighth Amendment rights. On October 4, 2013, Bradshaw was "shoved" into a transport van by ESU officers before they transferred him to Bronx Court, despite the fact that Bradshaw was already shackled. Plaintiff's Counter-Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1") (Doc. 94) ¶ 115; Bradshaw Dep. at 12:24–25, 13:12–16, 101:4–21. On October 28, 2013, Bradshaw was threatened by ESU officers and captains who told him that the next time he was being transported to Bronx Court, they would physically assault him. *See id.* at 100:10–25, 154:4–23.

On June 10, 2015, Bradshaw filed his complaint, alleging that the officers and captains who conducted or oversaw the strip searches violated his constitutional rights. *See* Compl., Doc. 2. The Complaint also alleged wrongdoing on the part of the City of New York, Dora Schriro, the Commissioner of the New York City Department of Correction, Brian Fischer, the Commissioner of the New York State Department of Correction and Community Supervision, Ada Perez, the Superintendent at Downstate Correctional Facility, William A. Lee, the Superintendent at Green Haven Correctional Facility, and a Captain John Doe at Green Haven Correctional Facility. *Id.* On August 24, 2015, noting that the Complaint did not make any allegations with respect to Green Haven or Green Haven personnel, the Court dismissed any

---

[4] Defendants assert in their 56.1 Statement that when Bradshaw referred to the cells as "dirty," he meant that at Downstate, he was searched barefoot near the toilet and at Bronx Court the floor had dirt from his boots. *See* Defs.' 56.1 ¶¶ 12–13. In his deposition, however, Bradshaw explained that none of the cells in which he was searched had the mats normally places on the floor in designated search areas. Bradshaw Dep. at 40:1–8. He also explained that he saw dirt on the floors when he came into the cells at Downstate and Bronx Court. *See id.* at 40:20–41:16.

4

claims against William A. Lee. Doc. 6.[5] On March 7, 2017, the Court dismissed all claims against Brian Fischer and Ada Perez. Doc. 61. On July 24, 2017, Defendants the City of New York, Larry Wilson, and Dora Schriro moved for summary judgment. Doc. 81.

## II. LEGAL STANDARD

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

---

[5] The Court did not, however, dismiss the claim against Captain John Doe 1 of Green Haven. For the reasons stated in the Court's Order of Service dismissing Green Haven Superintendant William A. Lee, the Court now dismisses all claims against Captain John Doe 1.

5

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)). However, a motion for summary judgment cannot be defeated on the basis of conclusory assertions, speculation, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998)). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson*, 477 U.S. at 256–57).

Nonetheless, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted).

## III. DISCUSSION

In support of their motion for summary judgment, Defendants make four primary arguments. First, Defendants argue that the bulk of the strip searches detailed in Bradshaw's Complaint and discussed in his deposition fall outside the relevant three year statute of limitations. Second, Defendants argue that Bradshaw's Fourth and Eighth Amendment claims

fail with respect to the strip searches because all searches were conducted for a legitimate penological purpose, and even if they were not, Defendants are entitled to qualified immunity. Third, Defendants argue that the threat made and limited physical force used against Bradshaw by ESU officers and captains on two discrete occasions do not rise to the level of an Eighth Amendment violation. Finally, Defendants argue that even if Bradshaw's Section 1983 claim survives, it should be dismissed against Defendants Dora Schriro, Larry Wilson, and Captain John Does 1–30 for lack of personal involvement.

### A. Statute of Limitations

First, Defendants argue that at least some of the allegedly unconstitutional strip searches were conducted more than three years ago, which they argue is outside the statute of limitations for a Section 1983 case brought in New York. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem.") (Doc. 82) at 11–12. For Section 1983 claims, courts in this Circuit "apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). In New York, the statute of limitations for a Section 1983 claim is therefore three years. *Id.*

Several of the strip searches that form the basis of Bradshaw's claim did occur more than three years prior to Bradshaw's filing of the Complaint on June 10, 2015. *See* Defs.' 56.1 ¶¶ 40–52 (detailing strip searches that occurred between May 1, 2012 and May 31, 2012). However, some courts in this District have determined that the statute of limitations for civil rights claims should be "tolled while an inmate exhausts his administrative remedies by filing an inmate grievance(s)." *Anderson v. Romano*, 08 Civ. 559 (JSR) (KNF), 2009 WL 602965, at *4 (S.D.N.Y. Mar. 6, 2009) (citing *Taylor v. N.Y.S. Dep't of Corr.*, No. 03 Civ. 1929 (PKC), 2004 WL 2979910, at *10–11 (S.D.N.Y. Dec. 22, 2004)); *see also Best v. Newton*, 15 Civ. 4316 (ER),

2016 WL 5416505, at *5 (S.D.N.Y. Sep. 28, 2016) (assuming, without deciding, that the statute of limitations would be tolled during the exhaustion of administrative remedies). Here, Bradshaw filed a complaint with the New York State Inmate Grievance Resolution Committee on October 11, 2013. *See* Compl. Ex. 5. Bradshaw also sent complaints to the New York City Department of Corrections. *Id.* Exs. 3, 9–10. Bradshaw continued to pursue relief through February 10, 2015 by writing letters to the Inmate Grievance Resolution Committee and appealing the adverse decision he received. *Id.* ¶¶ 72–98. Thus, the Court cannot say that consideration of the strip searches predating June 10, 2012 is time-barred and will not disregard the eight searches that occurred between May 1 and May 31, 2012.

### B. Constitutionality of Bradshaw's Strip Searches

Defendants also argue that Bradshaw's claim fails as a matter of law because strip searches that are conducted for a penological purpose are constitutional under either the Eighth or Fourth Amendments.[6] Defs.' Mem. at 3; Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgement ("Reply Mem.") (Doc. 95) at 2–3. Bradshaw primarily presents two arguments in opposition. First, Bradshaw argues that there was no penological purpose animating the strip searches that were conducted after periods of time where Bradshaw remained isolated from other inmates and under continuous surveillance. *See* Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp.") (Doc. 94) at 2. Second, Bradshaw argues that the semi-public location and dirty condition of the intake cells

---

[6] Defendants also argue that the Eighth, not the Fourth Amendment applies to Plaintiff's claim because in *Bell v. Wolfish*, the Supreme Court found that with respect to the constitutionality of strip searches, "the rights of sentenced inmates are to be measured by the different standard of the Eighth Amendment." Reply Mem. at 1–2 (quoting *Bell v. Wolfish*, 441 U.S. 520, 528 (1979)). Since that time, however, the Second Circuit has affirmed that the "maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy." *Colvino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992) (finding that random visual body-cavity searches conducted in an inmate's room with the door closed do not run afoul of the Fourth Amendment). Thus, under binding Second Circuit precedent, sentenced inmates "retain a limited right to bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016).

8

in which the searches took place show that the searches were conducted for the purposes of degrading him rather than for a penological purpose. *Id.* at 1–2. The Court will address each argument in turn.

1. **Subsequent Strip Searches**

When considering the policies and practices of correctional facilities, the Supreme Court has emphasized the "importance of deference to correctional officials" and explained that regulations affecting inmates' constitutional rights "must be upheld if it is reasonably related to legitimate penological interests." *Florence v. Bd. Of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)) (internal quotations omitted). Courts have therefore upheld the constitutionality of strip searches in a variety of contexts. Visual body cavity searches may be appropriate after "contact" visits with people outside of the correctional facility, even in the absence of probable cause. *Bell*, 441 U.S at 558–60. Strip searches may also be appropriate after disruptive confrontations or altercations at the facility, even if the inmates searched were not directly involved. *See Show v. Patterson*, 955 F. Supp. 182, 191–92 (S.D.N.Y. 1997).

At the same time, not every strip search conducted by corrections officers is constitutional, and the searches conducted of Bradshaw, each a "strip search with body-cavity inspection," is "the practice that 'instinctively' has given the Supreme Court 'the most pause.'" *N.G. v. Connecticut*, 382 F.3d 225, 233 (2d Cir. 2004) (quoting *Bell*, 441 U.S. at 558)). In *N.G. v. Connecticut*, detained juveniles were subjected to strip searches upon their admission to detention facilities, and then again after being transferred to subsequent facilities, even though they had been shackled and supervised during the pendency of the transfer. *Id.* at 228–29. The Second Circuit held that "whatever the justification for strip searches upon initial admission to a

first detention facility, we see no state interest sufficient to warrant repeated strip searches simply because of transfers to other facilities." *Id.* at 233–34. The court determined that the state's ability to "maintain surveillance during custody after an initial strip search . . . render[ed] unreasonable a subsequent strip search in the absence of a reasonable suspicion of possession of contraband." *Id.* at 234. Since then, the Circuit has reaffirmed that a strip search policy is not "reasonably related to penological interests" where inmates are searched "when there was no possibility that they could have obtained contraband." *See Turkmen v. Hasty*, 789 F.3d 218, 260 (2d Cir. 2015), *rev'd in part on other grounds sub nom. Ziglar v. Abasi*, 17 S. Ct. 1843 (2017). Even more directly on point, another court in this District has denied summary judgment where a convicted inmate complained of being subjected to a visual body cavity search at his detention facility at Rikers Island, then again after being transported to the Bronx Supreme Court. *Vasquez v. Williams*, No. 13 Civ. 9127 (LGS), 2015 WL 4757657 (S.D.N.Y. Aug. 11, 2015). The court found that "[i]n the absence of any legitimate penological interest, the second search violated Plaintiff's right to be free from unlawful searches." *Id.* at *5.

In this case, for searches arising on and after April 24, 2013, Bradshaw was strip searched at least twice: first, upon leaving Green Haven for Downstate, and second, upon leaving Downstate for Bronx Court. *See* Pl.'s 56.1 ¶¶ 84, 87, 89, 92, 95, 98, 101, 102, 105, 108, 112, 115, 118, 121, 124. Defendants argue that "the ESU officers, who were DOC employees, had no obligation to rely on a search of plaintiff that had been conducted at Green Haven Correctional Facility by state correctional personnel prior to ESU officers taking plaintiff into city custody for transport to court." Reply Mem. at 7. But in *Vasquez*, the court specifically rejected the argument that the second search was reasonable because Defendants did not personally conduct the first search. *Vasquez*, 2015 WL 4757657, at *5; *see also Balkum v. Sawyer*, No. 06 Civ.

10

5041206 (NPM), 2011 WL 5041206, at *8 (N.D.N.Y. Oct. 21, 2011) ("The court has been unable to find any authority to suggest that the change in custody affects the determination of whether subsequent strip searches are unreasonable. In the absence of any authority to suggest otherwise, a reasonable jury could find that the second search . . . was unreasonable and unnecessary."). This Court agrees. Bradshaw argues that he was under continuous surveillance between his strip search at Green Haven and his strip search at Downstate. *See* Pl.'s 56.1 ¶¶ 84, 87, 89, 92, 95, 98, 101, 102, 105, 108, 112, 115, 118, 121, 124. Although the record is less developed here than in *Vasquez*, Bradshaw stated that he was under guard escort beginning at Green Haven before being transported to Downstate and strip searched. *See* Bradshaw Dep. at 180:16–181:1, 181:22–182:1. Bradshaw also referenced being kept in shackles during at least some part of his transportation to and from Bronx Court. *See id.* at 101:19–20, 154:18–23. For their part, Defendants do not present any evidence showing that there was a possibility or even a legitimate fear that Bradshaw could have come into possession of contraband during the transfer from Green Haven to Downstate. Construing these facts in the light most favorable to Plaintiff, the Court concludes that a reasonable juror could determine that the strip searches at Downstate occurring on or after April 24, 2013 violated Bradshaw's Fourth Amendment rights.[7]

Further, the evidence shows that once at Bronx Court, Bradshaw was placed in barred and gated single-occupant cells that were in range of surveillance cameras mounted outside the cells. Defs.' 56.1 ¶¶ 34–36. If he ever left the cell to go into the courtroom, he was handcuffed and under continuous escort. Bradshaw Dep. 93:25–94:24. On at least one occasion, Bradshaw

---

[7] There are fifteen relevant searches, conducted on the following dates: April 24, 2013, May 7, 2013, June 4, 2013, June 12, 2013, June 27, 2013, July 10, 2013, July 15, 2013, August 20, 2013, August 21, 2013, September 3, 2013, September 5, 2013, October 4, 2013, November 4, 2013, November 22, 2013, and December 9, 2013. *See* Pl.'s 56.1 ¶¶ 84, 87, 89, 92, 95, 98, 101, 102, 105, 108, 112, 115, 118, 121, 124.

never left the intake cell at all while at Bronx Court. *Id.* at 119:13–14. Defendants do not put forward any arguments to show why there was a "possibility that [Bradshaw] could have obtained contraband" during his short stays at Bronx Court if he were continuously under video or officer surveillance and in either barred cells or handcuffs. *Cf. Turkmen*, 789 F.3d at 260. Nor do Defendants point to any cases in which a court has found reasonable a visual body cavity search prior to *leaving* a court facility, when a strip search was also conducted prior to *arriving* at a court facility. Defendants argue that *Israel v. City of New York* supports their position, because in that case, a court in this District determined that the strip searches were "in line with DOC policy to strip search prisoners upon entering and leaving the confines of the facility, which serves the legitimate interest of preventing the smuggling of contraband." *Israel v. City of New York*, No. 11 Civ. 7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012) (internal citations omitted). However, both searches in *Israel* took place in the prison prior to departure for the court appearance, rather than at the court facility after spending a day under continuous escort. *Id.* Further, *Israel* does not address the question here, which *N.G.*, *Turkmen*, *Vasquez*, and *Balkum* did address—the constitutionality of *subsequent* strip searches when an inmate has been confined and under continuous surveillance during the period between searches. Therefore, the Court finds that a reasonable juror could conclude that the end-of-day searches at Bronx Court were unreasonable and violated Bradshaw's Fourth Amendment rights. The Court will therefore deny Defendants' motion for summary judgment with respect to the morning searches at Downstate after April 24, 2013, and the evening searches at Bronx Court.[8]

---

[8] Defendants argue that even if there were a constitutional violation, they are entitled to qualified immunity because "it is not clearly established that . . . city correctional personnel are precluded from conducting subsequent searches of prisoners received from state correctional facilities/personnel." Reply Mem. at 7–8. However, in *Vasquez*, a 2015 case considering the same issue, Judge Schofield determined that qualified immunity was inappropriate because "construing all facts in Plaintiff's favor, it would be objectively unreasonable for a corrections officer in Defendants' position to conduct the second strip search because such an officer knows or should know the restrictive conditions under which a [category] prisoner like Plaintiff is transferred to the Bronx Supreme Court." *Vasquez*,

## 2. Manner of Strip Search

Additionally, Bradshaw argues that the manner in which he was strip searched was unconstitutional for three reasons: first, because he requested to be searched in a designated area by a single officer, but ESU captains denied his request; second, because he was searched in view of a surveillance camera and other inmates and officers; and third, because he was searched on a dirty floor. Bradshaw argues that the ESU officers searched him in this way "to punish, degrade and to make a spectacle of Plaintiff." *See* Pl.'s Opp. at 1–2. Defendants argue that none of the conduct Bradshaw has pointed to rises to the level of a constitutional violation under *Show v. Patterson*, 955 F. Supp. 182 (S.D.N.Y. 1997). *See* Reply Mem. at 2–3.

The Court agrees with Defendants that none of the conduct Bradshaw points to constitutes violations of his Fourth or Eighth Amendment rights. Under the Eighth Amendment, any allegations must be "objectively [and] sufficiently serious" to constitute "a harm of federal constitutional proportions." *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir. 1997). The denial of a request to be searched in a designated area does not rise to the level of a harm that is "objectively" serious where, as here, the searching area was already substantially private and Bradshaw had no religious objections to being searched in a group. *Cf. Show v. Patterson*, 955 F. Supp. 182, 191–92 (rejecting an Eighth Amendment claim where Defendants instructed plaintiffs to strip in a group and ignored one plaintiff's request to be searched privately due to his Muslim faith). Similarly, although the parties disagree about the extent to which the floors in the intake cells were dirty, the fact that Bradshaw was required to stand on a dirty floor for no more than five minutes at a time does not rise to a level of constitutionally serious harm. *See Blackson v. City of New York*, No. 14 Civ. 452 (VEC), 2014 WL 6772256, at *4 (S.D.N.Y. Dec. 2, 2014)

---

2015 WL 4757657, at *5 (citing *Turkmen*, 789 F.3d at 218). This Court agrees with the holdings of *Vasquez* and *Turkmen*, and finds that Defendants are not entitled to qualified immunity.

(finding that claims that a holding area was "dirty and stinking" did not rise to the level of a constitutional violation); *Williams v. Carbello*, 666 F. Supp. 2d 373, 379 (S.D.N.Y. 2009) (finding that nonspecific claims that an area of an inmate's cell was "unclean" could not state a Section 1983 claim). Furthermore, neither of these claims—the denial of an inmate's request and the state of the floors in intake cells—implicate the Fourth Amendment, which asks whether an invasion of an inmate's privacy was reasonable.

Finally, with respect to the fact that Bradshaw's strip search was conducted in view of inmates in adjacent cells, surveillance cameras, and inmates and guards walking through the halls, numerous courts have found that public strip searches do not violate the Fourth or Eighth Amendments. *See Show*, 955 F. Supp. at 191–92 (finding that forcing inmates to strip and stand in a group so close together that their "'private parts' were touching one another" did not violate the Eighth Amendment); *Israel*, 2012 WL 4762082, at *3 (finding that "the presence of other inmates and officers . . . does not" make an otherwise constitutional search unreasonable under the Fourth Amendment); *Smith v. City of New York*, No. 14 Civ. 5934 (JCF), 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015) (same). Therefore, the Court will DENY Defendants' motion for summary judgment with respect to the strip searches detailed in Paragraphs 43, 46, 49, 52, 55, 58, 61, 64, 66, 69, 72, 75, 77, 80, 83, 84, 86, 87, 89, 91, 92, 94, 95, 97, 98, 100, 101, 102, 104, 105, 107, 108, 111, 112, 114, 115, 117, 118, 120, 121, 123, 124, 126, 127, and 128 of the Complaint and will GRANT Defendants' motion for summary judgment with respect to the remaining searches.

### C. Excessive Force Claims

The focus of Bradshaw's Section 1983 claim is unquestionably the legality of the strip searches he was subjected to. *See* Compl. ¶ 71 (listing injuries as "shame and humiliation as a

14

result of strip frisk searches; negligent infliction of emotional distress, or intentional infliction of emotional distress; and past and future mental and emotional injuries and suffering."). However, Bradshaw has also made reference to being "assaulted and battered" in violation of the Eighth Amendment in the course of being transported to Bronx Court on October 4, 2013. *E.g.*, Pl.'s 56.1 at ¶ 115. Although Bradshaw does not make any allegations with respect to assault in the narrative section of his Complaint detailing the searches he was subjected to on October 4, 2013, two exhibits Bradshaw attached to the Complaint, do offer allegations that on that day, ESU officers "shoved" him into the transport van before transferring him to Bronx Court. Compl. Ex. 5 (Inmate Grievance Complaint dated October 11, 2013), Ex. 9 (Letter of Complaint to Dora Schriro, dated October 19, 2013). In his deposition, Bradshaw also referenced "times that I was threatened; physically shoved, pushed on occasions." Bradshaw Dep. at 12:24–25, 13:12–16. Bradshaw also discussed the October 4, 2013 incident specifically, and stated that the ESU officers "kept shoving me while I was shackled."[9] *Id.* at 101:19–20. Separately, Bradshaw has also stated that he was "threatened" by ESU officers and captains. *See* Pl.'s Opp. at 2; 100:14–25, 154:4–23. With respect to allegations that Bradshaw was threatened, Exhibit 10 to the Complaint states that on October 28, 2013, ESU officers and captains stated that they would "beat" Bradshaw the next time he was brought to Bronx Court. *See* Compl. Ex. 10 (Letter of Complaint to New York City Board of Corrections, dated October 29, 2013).

Defendants argue that "should the Court interpret the complaint to include such a[n excessive force] claim, plaintiff's allegations of being shoved and threatened are insufficient to state a claim for excessive use of force, because the force used was *de minimis* and threats do not rise to an Eighth Amendment violation." Reply Mem. at 4. The Court is obligated to liberally

---

[9] In his deposition, Bradshaw refers to the date of that incident as October 19, 2013. However, Bradshaw seems to be inadvertently providing the date on which he drafted a letter complaining about the incident. *See id.* at 101:4–21.

construe *pro se* pleadings and to read them "to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)). Here, the Court will read the Complaint to include allegations of excessive force due to the October 4, 2013 incident, which is referenced in Exhibits 6 and 9 to the Complaint. Although the Court notes that Bradshaw did not allege that he was transported to Bronx Court or strip searched on October 28, 2013, the Court will also read the Complaint to include a claim for an Eighth Amendment violation based on the threats Bradshaw received on that day.

In determining whether the use of force constitutes an Eighth Amendment violation, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Cox v. Fischer*, 248 F. Supp. 3d 471, 485 (S.D.N.Y. 2017) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). An Eighth Amendment claim is tested on an objective standard, which focuses on the use of force "in light of contemporary standards of decency" and a subjective standard, which focuses on whether the corrections officer "possess[ed] a wanton state of mind." *Perry v. Stephens*, 659 F. Supp. 2d 577, 581 (S.D.N.Y. 2009) (internal citations omitted).

"An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38. Here, Bradshaw stated in his deposition that the October 4, 2013 incident was the only time physical force was used and that he did not sustain any injuries. *See* Bradshaw Dep. 102:10–16. The Court finds that this shove was only a *de minimis* use of force and does not run afoul of the Eighth Amendment. *E.g.*, *Perry*, 659 F. Supp. 2d at 582–83 (finding no Eighth Amendment violation

where a corrections officer "slapped" and subsequently "began choking" a shackled inmate who had previously refused to comply with transportation instructions).

With respect to the October 28, 2013 incident, Bradshaw stated in his deposition that ESU Officer McArdle and ESU Captains Mitten and Harris told him that they would "beat" him up and "bust" his head. *See* Bradshaw Dep. at 100:14–25, 154:4–23. However, "the law is clear that although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under Section 1983." *Vaughn v. Strickland*, Nos. 12 Civ. 2696, 12 Civ. 3335, 12 Civ. 2995, 12 Civ. 3333 (JPO), 2013 WL 3481413, at *5 (S.D.N.Y. July 11, 2013) (quoting *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997)). Therefore, although the threats made to Bradshaw were likely intimidating and caused him to file an internal complaint, *see* Compl. Ex. 10, they do not rise to the level of a constitutional violation. Thus, the Court will GRANT Defendants' motion to dismiss Bradshaw's excessive force claims.

### D. Personal Involvement of Certain Defendants

Finally, Defendants point out that Bradshaw never alleged the personal involvement of Defendants Schriro and Wilson, who should be dismissed from the case. Defs.' Mem. at 9–10. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). A supervisory defendant may be found to be personally involved if "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In this case, several of Bradshaw's letters were addressed to or copied Defendant Schriro. *See* Compl. Exs. 3, 9, 10. However, while these letters detail some of Bradshaw's complaints,

including the October 4, 2013 incident and general complaints regarding the conditions of the intake cells, they do not detail Bradshaw's complaint that he was needlessly and unconstitutionally strip searched at Downstate because he had already been searched at Green Haven. *Id.* Personal involvement on a supervisory basis requires that the defendant be faced with "direct allegations" that would "permit an inference the [Defendant] had acted or failed to act in any of the ways that would subject [her] to personal liability." *Grullon*, 720 F.3d at 139. Furthermore, Bradshaw admitted that there was "no reason" for Schriro to be a named Defendant in this case. Bradshaw Dep. at 201:21–202:1; *see also* Pl.'s 56.1 ¶ 132–33 (admitting that Bradshaw does not intend for Defendant Schriro to be a named Defendant).

With respect to Defendant Wilson, Bradshaw has identified Wilson as one of the officers who conducted most of the strip searches in question. Bradshaw Dep. at 81:2–82:23. Bradshaw also stated, however, that he did not intend for Defendant Wilson to be a named Defendant in this case. *Id.* at 202:2–10; *see also* Pl.'s 56.1 ¶ 134 (admitting that Bradshaw does not intend for Defendant Wilson to be a named Defendant).

Finally, Defendants also seek dismissal of all claims against Captain John Does 1–30 for lack of personal involvement. Defs.' Mem. at 10–11. Defendants argue that because no ESU captain was present during the pendency of the search itself, none could be liable for any constitutional deprivation suffered by Bradshaw. However, the Court finds that Bradshaw's testimony on this point is equivocal. Bradshaw stated in his deposition that ESU captains were personally present immediately before any strip searches, and that Bradshaw frequently requested that they allow him to be searched in a designated searching area. *See* Bradshaw Dep. at 181:22–24 (stating that "two officers come inside to get me with the captain"). At other points in the deposition, Bradshaw seemed to suggest that ESU captains did not go inside the

18

correctional facility. *See id.* at 180:19–23 ("The officers that's in the vehicle with the captain stays outside . . . . Two vans come. One van has the captain and two officers and the other van [has] just the two [other] officers and I'm in the van with just the two officers."). Drawing all reasonable inferences in favor of Bradshaw, the Court finds that there is a dispute of material fact as to the level of personal involvement of the ESU captains. Therefore, the Court will GRANT Defendants' motion to dismiss all claims against Defendants Wilson and Schriro, and will DENY Defendants' motion to dismiss against Defendants Captains John Doe 1–30.

## IV. CONCLUSION

Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically, the Court grants so much of the motion as it seeks dismissal of Plaintiff's excessive force claims and fourth amendment claims with respect to the strip searches detailed in Paragraphs 40, 44, 47, 50, 53, 56, 59, 62, 65, 67, 70, 73, 76, 78, and 81 of the 56.1 Statement, and denies Defendants' motion for summary judgment with respect to the remaining strip search claims.

The parties are directed to appear for a status conference on March 8, 2018 at 10:30 a.m. The Clerk of Court is respectfully directed to terminate the motion (Doc. 81), to dismiss Dora Schriro, Larry Wilson, and Captain John Doe 1 of Green Haven Correctional Facility as Defendants, and to mail a copy of this order to Bradshaw.

It is SO ORDERED.

Dated: February 9, 2018
       New York, New York

                                            Edgardo Ramos, U.S.D.J.